U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

NOV 21 2006

ROBERT H. SHEMWELL, CLERK
BY_____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

PEGGY GUILLOT

VERSUS

UNUM PROVIDENT CORP

CIVIL ACTION 05-0858

DISTRICT JUDGE DEE D. DRELL

U.S. MAGISTRATE JUDGE JAMES D. KIRK

## REPORT AND RECOMMENDATION

This Employees Retirement Income Security Act ("ERISA") case, 29 U.S.C.1001 et seq., is referred to me by the district judge for Report and Recommendation. The case is ready for decision on briefs on the merits in accordance with the ERISA Case Order [Doc. # 12].

### Facts

Claimant, Peggy Guillot, 50 years old, was born on January 22, 1956. She began working for Avoyelles Home Health (AHH) on January 12, 1993 as an LPN. She was the company's Chief Financial Officer when she left her employment on November 30, 1999.

Guillot's job required that she supervise other employees, stand some, sit some, and lift and carry files. Although she did not suffer an injury while working at AHH, in May of 1996, she began to have diffuse pain in her back, legs, shoulders and hips. She was

treated by several doctors and received extensive testing and treatment with steroids and other medications and physical therapy.

Guillot alleges that her pain persisted and that she began having significant difficulty performing her job duties. She claims she received increased pressure from her supervisor and her treating physician, Dr. Malin, to stop working. Malin restricted plaintiff from prolonged sitting, standing, and stooping and from repetitive joint motions. Plaintiff filed a claim for disability benefits on October 19, 1999 claiming total disability as of October 1, 1999. Guillot stated that she performed light housekeeping, read, watched "a little TV", would lie down or sit in a recliner, and shopped occasionally. Benefits were awarded from December 30, 1999 to January 30, 2000 while the company completed its review of the claim, but then benefits were terminated and denied. Guillot appealed but her claim denial was upheld on July 27, 2000. This action followed.

## Standard of Review

In accordance with this court's standing ERISA Case Order, the parties agree that the group long term disability plan (Plan) issued by defendant, Paul Revere Life Insurance Company (Paul Revere)[1] to AHH is an employee welfare benefit plan, as defined by the provisions of ERISA and that this case is governed by ERISA and that all state law claims are preempted. The parties also agree that the

---

[1] Incorrectly named in plaintiff's complaint as UNUMProvident Corp.

Plan provides the administrator with discretionary authority to interpret the provisions of the Plan and to make findings of fact and determine eligibility for benefits. Both Claimant and Defendant agree that the administrative record is complete. However, because the administrator is both insurer and administrator and is thus conflicted, the court may give less deference to the administrator's decision. <u>Vega v. National Life Insurance Services, Inc.</u>, 188 F.3d 287, 299 (5th Cir. 1999).

### The Plan

The Plan provides, in pertinent part:

TOTAL DISABILITY or TOTALLY DISABLED means that during the Elimination Period and the first 36 months after completing the Elimination Period, the Employee:

1. is unable to perform **the important duties of his own occupation** on a Full-time or part-time basis because of an Injury or Sickness that started while insured under this Policy; and
2. does not work at all; and
3. is under Doctor's Care.

After 36 months of Own Occupation benefits have been paid, the Employee will continue to be Totally Disabled if he can not work in any occupation for which he is or may become suited by education, training or experience. [Emphasis added in bold type]

The Plan also provides for partial disability benefits if the employee is working and is "unable to perform all the important duties" but is able to perform "one or more" of them.

### The Medical Records

Plaintiff initially treated with her family physician, Dr. Warren Plauche, complaining of diffuse pain in her back, legs, shoulders and hips. X-rays and MRI's were ordered by him but he referred plaintiff to a neurologist, Dr. Elke Werner.

On January 15, 1997, plaintiff was seen by a neurologist, Dr. Elke Werner. Dr. Werner reported that plaintiff's complaints began abruptly in November 1996 with pain between the shoulder blades which interfered with sleep. The pain progressed and spread to the mid and low back, buttocks and legs as well as the neck. Plaintiff had been tried on Medrol dose paks, Elavil, Valium and Vicodin. Plaintiff had a bone scan which showed "mild uptake" in the sternomanubrial junction felt to be mildly degenerative and some uptake in the left knee, greater trochanter and the left femur. An MRI scan of the low back, L2-3, showed early or minimal degenerative changes, but no protrusion or herniation. At L4-5, there was a minimal posterior bulge. X-rays of the low back also showed "minute" changes at L2-3. Thoracic (mid-back) spine X-rays showed some minimal arthritic bone spurring. Minimal arthritic changes were seen in both sacroilliac (SI) joints.

Dr. Werner noted that plaintiff reported having difficulty getting out of a chair and climbing stairs. She had tender points in the neck and shoulders and paraspinous muscles between the shoulder blades. Plaintiff was also tender in the low back and in the SI joints. Based on a review of plaintiff's history, medical

records and test results, including the bone scan, MRI and X-rays, Dr. Werner suspected fibromyalgia[2]. Plaintiff also had some sensory polyneuropathy.

In January, X-rays of plaintiff's neck revealed minimal arthritis.

In January, Dr. Werner noted that EMG studies were negative, but plaintiff still complained of pain, primarily in her neck. In February, 1997, Dr. Werner reported that Prednisone had completely eliminated plaintiff's complaints. In March, the Prednisone had been discontinued and the symptoms had returned. At that time plaintiff had chronic low back and neck pain with radiation to the legs which the doctor suspected was fibrositis.

In April and May of 1997 plaintiff saw Dr. Goldware and he found no herniation in plaintiff's back and referred her to a rheumatologist, Dr. Malin. Goldware diagnosed neck, mid back and left leg pain.

---

[2] Fibromyalgia is an increasingly recognized chronic pain illness which is characterized by widespread musculoskeletal aches, pain and stiffness, soft tissue tenderness, general fatigue and sleep disturbances. The most common sites of pain include the neck, back, shoulders, pelvic girdle and hands, but any body part can be involved. Fibromyalgia patients experience a range of symptoms of varying intensities that wax and wane over time. To diagnose fibromyalgia, doctors must rely on patient histories, self-reported symptoms, a physical examination and an accurate manual tender point examination. It may take five years to obtain an accurate diagnosis which is made based on standardized criteria. The diagnosis requires a finding of widespread pain in all four quadrants of the body for a minimum duration of three months and tenderness in at least 11 of 18 trigger points. MedlinePlus.com, a service of the U.S. National Library of Medicine and the National Institute of Health.
   The Fifth Circuit has described fibromyalgia as "an elusive but debilitating affliction" that "is characterized by complaints of generalized pain, poor sleep, an inability to concentrate, and chronic fatigue." Black v. Food Lion, Inc. 171 F.3d 308, 309 (5th C. 1999). Other courts have recognized the disease as well. See for example, Jusino v. Barnhard, 2002 WL 31371988 (E.D. Pa.).

In June of 1997, an MRI of the hips was normal. In October of that year an MRI of the low back was normal, as was an MRI of the pelvis. X-rays of the pelvis and hip in July 1997 were normal. A repeat bone scan still showed increased uptake in plaintiff's left hip, sternum and left knee as well as the ethmoid region.

In September 1997, physical therapy was prescribed by Dr. Malin but it was not helpful.

The record reveals that plaintiff had been seeing Dr. Jennifer Malin, a rheumatologist, since 1997. She tried various medications, including Methotrexate, Prednisone, and Vioxx, as well as antiinflammatory medications.

In December of 1997, plaintiff reported to Dr. Malin that cortisone was the only thing that would help her pain. Dr. Malin reported that plaintiff was still complaining of bilateral hip pain and moving into the posterior neck and shoulders. Dr. Malin reported: "[s]he has no quality of life, can't shop and is having to miss work." Despite the risks, Dr. Malin decided to put her back on Prednisone.

In September 1998, an MRI of the pelvis showed fluid collection in the right hip "consistent with significant inflamation". Another bone scan in September 1998 showed increased uptake in the right hip consistent with arthritis or with avascular necrosis. The study also revealed "probable patellar chondromalacia". In November of 1999 a

bone scan showed mild degenerative changes in the patella femoral joint.

In November of 1998 Guillot saw Dr. Duval, an orthopedic surgeon, for evaluation of bilateral hip pain and right knee pain. Dr. Duval did not see evidence of avascular necrosis but felt that she had "a bad case of trochanteric bursitis" in the right hip. He injected the hip and considered recommending physical therapy.

In July of 1999, plaintiff reported to Dr. Malin that her trochanteric bursitis had gone away. At that time, she was having no other problems related to her inflammatory arthritis. In November 1999 Dr. Malin completed the Attending Physician's Statement and opined tht Plaintiff was unable to work secondary to severe pain and joint inflammation as of September 30, 1999.

Dr. Malin characterized plaintiff's condition as; "inflammatory arthritis" and was pursuing "aggressive therapy as of January 2000. At that time, she began treating plaintiff with Enbrel. It was at that time that Dr. Malin, in response to specific questions posed to her by Paul Revere, stated that plaintiff was restricted from "prolonged standing, sitting, stooping. No repetitive joint motions."

## Review for Abuse of Discretion

Claimant, through counsel, argues that there does not exist in the record substantial evidence to support the decision of the administrator and that he abused his discretion.

"An administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial.'" Lain v. UNUM Life Ins. Co. of America, 279 F.3d 337, 342 (5th Cir. 2002). There must be "concrete evidence" in the administrative record that supports the denial of the claim. Id. The administrator's decision should be reversed only if it is arbitrary or capricious, that is, if the record lacks substantial evidence to support the Plan Administrator's benefit determination. See Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc., 168 F.3d 211, 215 (5th Cir. 1999). See also Vega v. Nat'l Life Ins. Servs., 188 F.3d 287, 299 (5th Cir. 1999).

In the attending physician's statement, Dr. Malin suggested that plaintiff is totally disabled. She also stated that plaintiff was prohibited from prolonged sitting, standing, and stooping and, additionally, from engaging in repetitive joint motions.

Paul Revere had its own medical expert, Dr. Curtis, review plaintiff's claim. Dr. Curtis noted that few manual tasks were required of plaintiff in her job. He concluded that "claimant does evidence joint inflammation whose etiology appears not to be well established. Restrictions against prolonged standing, sitting or stooping seem to be reasonable especially during periods of

8

exacerbation. The proscription of all repetitive motion seems to be somewhat extreme." Curtis also noted that prolonged standing "is generally not required" in plaintiff's job. While he observed that much of plaintiff's work day involved sedentary activities, "there seem to be both sufficient opportunity and autonomy to change position often." Curtis also said that the "few manual duties would seem to involve relatively little of most work days, and even where report writing, etc., is necessary, the potential for assigning many of the manual aspects to her subordinates seems to be quite feasible." Curtis concluded that, given the listed restrictions, Guillot appeared able to function adequately to return to the performance of the duties of her occupation.

Plaintiff, through counsel, repeatedly urges this court in brief to give greater weight to plaintiff's treating physicians than to Dr. Curtis. However, as counsel admits, a treating physician rule, whereby greater deference is accorded a treating doctor's opinion, has been rejected by the Supreme Court. <u>Black and Decker Disability Plan v. Nord</u>, 123 S.Ct. 1965 (2003).

Plaintiff also argues that even though "the defendant's own in-house physician agreed that she could not perform the majority of her requisite job duties-prolonged sitting, standing and stooping", Paul Revere nevertheless denied benefits. Guillot suggests that a claimant must be able to carry out all requisite tasks set forth by the employer for the job in order to be found not disabled. In other

9

words, plaintiff argues that if plaintiff cannot perform even one of the material duties of her job, then she is disabled. In support of her argument, she cites McGill v. Unum Provident Corp., 2005 WL 887283 (E.D.La. 2005). However, Guillot's reliance on McGill is misplaced. In McGill, the court considered policy language similar to that in the instant case. In interpreting the policy language, the court acknowledged the 5th Circuit's holding in Ellis v. Liberty Life Assurance Co. of Boston, 394 F.3d 262 (5th Cir. 2005) that the plan language "unable to perform all" means "not able to perform every", yet still held otherwise on the facts of that case.

This court is required to follow 5th Circuit precedent and Ellis, supra, sets forth clearly the 5th Circuit's interpretation of policy language similar to that at issue here.[3] In Ellis, the court reasoned that to interpret "unable to perform all" as unable to perform any one of the duties would create a conflict in the policy since the definition of partial disability was the inability to perform one or more duties.

---

[3] The two approaches to interpretation of this and similar policy language is discussed in an informative opinion by the district court in Hamaker v. Paul Revere Life Ins. Co., 2004 WL 963701 (S. D. Ind. 2004). One approach looks at effects and recognizes that some skills or duties are "essential" to continued employment in a particular occupation in any capacity. Under that line of reasoning, "regardless of the number of important duties an insured can still perform in isolation, he or she is totally disabled if unable to practice his or her regularly [sic] occupation in toto and residually disabled if merely restricted in that practice." This approach is adopted by the Seventh Circuit. Id.
The other approach is the one adopted by the 5th Circuit, as explained in the main text above, and also by the 8th Circuit. Cerner Corporation, 309 F.3d 1064, (8th Cir. 2002).

The policy language at issue here, "unable to perform the important duties" is essentially the same language interpreted by the 5th Circuit in Ellis-"unable to perform all of the material and substantial duties". The 5th Circuit's reasoning still holds true, when applied to the instant policy language, even with the elimination of the word "all". As in <u>Ellis</u>, to interpret this policy to allow total disability where even one job duty cannot be performed would create a conflict in the policy between the definitions of total disability and partial disability and the definitions would conflate.

Therefore, based on the 5th Circuit's analysis in <u>Ellis</u>, the legally correct interpretation of the policy is that it requires the inability to perform each and every material job duty in order for a claimant to be totally disabled. That is the interpretation given the Plan by Paul Revere in this case. <u>Wildbur v. ARCO Chem. Co.</u>, 974 F.2d 631, 637-8 (5th Cir.), modified, 979 F.2d 1013 (1992).

Two job descriptions were submitted to Paul Revere. The first, signed by plaintiff on July 11, 1997, provides that plaintiff's duties include coordinating the activities of other employees by performing certain duties personally or through subordinate supervisors. Those duties, listed as "essential duties", included analyzing and organizing office procedures, evaluating office production, establishing correspondence procedures, records management, planning office layouts, reviewing personnel records,

preparing activities reports, coordinating clerical workers and other administrative duties. Plaintiff listed her duties, in order of their importance, as typing, reviewing reimbursement records, maintaining a daily and monthly census, and preparing payroll and paying bills. Guillot reported on her claim form that she was required to bend and stoop and reach above shoulder level occasionally, and that balance and manual dexterity was also needed occasionally. She was required to lift 5 pounds, but no more than 10 pounds occasionally and carry 3 to 5 pounds occasionally. She was required to sit one hour at a time for 8 hours total in a day, stand one hour at a time for 2 ½ hours in a day, walk one hour at a time for 2 hours total in a day and drive ½ hour at a time and 1 ½ hours total in a day.[4]

The employer provided a job analysis which described plaintiff's job duties as standing 1 hour at a time for 2 ½ hours in a day, walking 10 minutes at a time for one hour in a day, sitting 1 hour at a time for 6 hours in a day, and driving for ½ hour a day. She was required to carry a patient chart 10 feet about 4 times a day and lift 1 pound frequently and 3 pounds occasionally. Guillot was required to have the ability to grasp, have fine manipulation abilities, and perform repetitive motions 4 times per hour. She was required to bend 2 percent of the time, reach 15

---

[4] Even recognizing that plaintiff might lift or carry and walk at the same time, and therefore there is some overlap in plaintiff's estimates, it is likely that plaintiff's estimates are not accurate since the employer reported that plaintiff's work day was 8 hours.

12

percent of the time, and balance 10 percent of the time. Her workday was reported by the employer as 8 hours.

Under the Plan definition of total disability, as interpreted by the 5th Circuit, in order to recover benefits, plaintiff must not be able to perform any of the material duties of her job. On the "Job Description" submitted November 10, 1999[5], plaintiff's "Essential Duties and Responsibilities" were primarily administrative--"analyzes", "organizes", "evaluates", "establishes", "formulates", "plans", "reviews", "coordinates", "maintains", "ensures", for example. The occupation description completed by plaintiff[6] listed the duties of plaintiff's employment "in the order of their importance" as typing, reviewing records for disbursement, maintaining daily and monthly census, and preparation of payroll and paying bills. Plaintiff stated that she sat, stood and walked no more than an hour at a time. She also listed "the five most essential factors required" to perform her job as "directing the activities of others", "working independently", "fine motor coordination", "meeting precise standards", "and wide variety of tasks". In the second Job Analysis provided by the employer[7], standing and sitting were again listed as no more than an hour at

---

[5] See Administrative Record, pp 2-5.

[6] See Administrative Record, pp. 23-24.

[7] See Administrative Record, p. 332.

13

a time, but walking was listed as 10 minutes at a time, instead of an hour.

Based on a fair reading of the two job descriptions and the job analysis, plaintiff's primary job duties appear to be supervising others and planning, paperwork of various kinds, and typing. She was required to sit or stand for no more than an hour at a time, and walk for ten minutes. Her job description specifically envisioned that plaintiff could accomplish her duties herself or through "subordinate supervisors". Her job also allowed independence and some degree of autonomy regarding the performance of her job. Therefore, Dr. Curtis was correct in observing that prolonged standing is generally not required, that plaintiff was allowed to change position often, and that some aspects of plaintiff's job duties could be assigned to subordinates.[8] He was also correct in concluding, based on the medical evidence, that restriction from all repetitive motion is "extreme".

The evidence does not show that prolonged standing or sitting is required in plaintiff's job. In any event, even if plaintiff cannot sit or stand for long periods or perform repetitive motion, because plaintiff can perform the administrative duties of her

---

[8] Ordinarily, consideration of the ability to assign ones job duties to another employee would be troublesome, for it arguably introduces a consideration not found in this policy–that of the ability to perform one's job with accommodation, as under the Americans with Disabilities Act. However, in this case, plaintiff's job duties specifically included assigning tasks to subordinates.

employment such as supervising others and assigning tasks to them, and because she can sit and stand for an hour or so at a time, she has not shown that she is unable to perform every important duty of her occupation.

## Conclusion

The medical evidence in the case shows that plaintiff has genuine complaints of pain in her joints which are, at least to some extent, supported by objective medical evidence and are non-responsive to treatment. Some restrictions on plaintiff's activities are appropriate. However, plaintiff is not unable to perform every duty of her occupation under the terms of the policy as interpreted by the 5th Circuit. The administrator did not abuse his discretion in so finding.

For the foregoing reasons, the Court finds, after reviewing the record and considering Paul Revere's dual role as insurer and plan administrator, that the decision of the administrator is clearly supported by substantial and concrete evidence and is thus neither arbitrary and capricious nor an abuse of discretion.

Therefore, IT IS RECOMMENDED that judgment be entered in favor of defendant, Paul Revere, and against claimant, Guillot.

## OBJECTIONS

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed.R.Civ.P. 72(b), the parties have five (5) business days from service of this Report and Recommendation to file specific, written

objections with the Clerk of Court. A party may respond to another party's objections within five (5) days after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes his final ruling.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FIVE (5) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT UPON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UN-OBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED in chambers, in Alexandria, Louisiana, on this the 21st day of November, 2006.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE